OPINION OF THE COURT
Nicholas Figueroa, J.
Petitioners seek a judgment, pursuant to CPLR article 78, annulling amendments to the zoning map and zoning text (collectively, the rezoning) covering five distinct neighborhoods (the five neighborhoods) in Far Rockaway, Queens. The challenged amendments, which revise the New York City Zoning Resolution of 1961 (the Resolution), were approved by the City Council on August 14, 2008. Petitioners, five real estate development companies, own a total of nine vacant lots within the rezoned area.
The rezoning affects all or a portion of approximately 280 blocks (covering roughly 5,900 tax lots) on the Rockaway Peninsula separating Jamaica Bay from the Atlantic Ocean. Zoning in the area had been largely unchanged since the Resolution was adopted some 50 years earlier. The Resolution encouraged construction of high-rise buildings and high density developments near the oceanfront, and various subsidy programs had acted as a further spur to such projects there and elsewhere on the peninsula. Nevertheless, in the half-century since the Resolution was put into effect, the five neighborhoods remained for the most part what they had been at the end of World War II, i.e., dominated by low-density and low-rise housing, with the relatively few single-use and multi-use commercial buildings mostly located on the area’s broader streets.
In the decades since the Resolution was adopted, however, development in the Rockaways had prompted calls by residents for more restrictive zoning to assure that the essential character *1073 of the area’s neighborhoods would be preserved. In the same period, there was also increasing community pressure for rezoning to permit limited-purpose commercial establishments within residential zones to serve the residents’ needs. At the same time, changing socioeconomic factors contributed to a rising demand for modest relaxation of the Resolution’s restrictions on the size of the footprints of houses in certain areas.
Eventually, formal applications to amend the zoning map and zoning text were prepared by the Queens office of the Department of City Planning (DCP) in light of some two years of studies and discussions with numerous civic groups and their consultants, elected officials, and developers. The applications were filed on April 16, 2008. An environmental assessment statement (EAS) was issued by the DCP on April 18, 2008, and a negative declaration (to the effect that the proposed amendments would not have a substantially adverse effect on the environment) was issued by the City Planning Commission (CPC) on April 21, 2008.
The rezoning applications were referred to Queens Community Board No. 14 and the Borough President for their review and recommendations to the CPC. In May and June 2008, public hearings on the application were held by the Community Board, the Borough President, and the CPC pursuant to the mandates of Uniform Land Use Review Procedure. In response to comments from the public, as well as to account for certain modifications of the original proposal, the DCP issued a revised EAS, which it forwarded to the Community Board, the Borough President, and the City Council on or about July 21, 2008. The CPC also issued a revised negative declaration, dated July 23, 2008. Notice of both revised documents was published in the Bulletin of the Department of Environmental Conservation on August 6, 2008. The revised documents were forwarded to the Community Board, Borough President, and City Council on or about August 13, 2008. Public hearings on the proposed amendments were held before Council committees on August 12, 2008, and August 13, 2008. On August 14, 2008, the Council approved the rezoning.
As a threshold matter, respondents question petitioners’ standing to challenge the rezoning.
Certain principles of standing are well established. Petitioners have standing to bring an article 78 proceeding only if the challenged agency action has caused them an “injury in fact” (Matter of Transactive Corp. v New York State Dept. of Social *1074 Servs., 92 NY2d 579, 587 [1998]) to an interest that the pertinent statutes were intended to protect (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211 [2004]). Moreover, where land use is in question, the injury claimed by petitioners must be different from the harm to which the public at large is exposed (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 774-775 [1991]). Furthermore, in a State Environmental Quality Review Act (SEQRA) case, given that statute’s purpose, the alleged injury must be to an environmental interest rather than solely to an economic interest (Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428, 433 [1990]), although the fact that petitioners also have an economic stake does not per se negate their standing (see Society of Plastics Indus. v County of Suffolk, supra; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406, 415 [1987]).
It is observed that petitioners’ pleading does not expressly claim that the rezoning’s alleged “adverse effect” on their lots is environmental in nature. But, as indicated above, those lots are located within the area subject to the rezoning. Accordingly, respondents’ citations to rulings denying standing where petitioners have not expressly claimed environmental harm and own land near (i.e., outside) a subject area are inapposite. By contrast, the present article 78 application is precisely the type for which the petitioners have standing because, as persons with interests directly affected by the challenged action, they are “presumptively aggrieved . . . and do not have to plead special damages or in-fact injury” (Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency at 433; Matter of Har Enters. v Town of Brookhaven, 74 NY2d 524 [1989]). Accordingly, it is concluded that petitioners have standing.
It remains to be decided, however, whether petitioners’ challenge to the rezoning has merit. The premise of such challenge is that the rezoning falls short of the requirements of the SEQRA (ECL art 8), and the regulations thereunder, as well as the regulations promulgated pursuant to Executive Order No. 91 (1977) of the Mayor of the City of New York entitled “City Environmental Quality Review” (CEQR) (now contained in 62 RCNY ch 5), and the Uniform Land Use Review Procedure set forth in several sections of the City Charter. Accordingly, the petition must be evaluated by reference to the applicable statutory and regulatory mandates, as discussed below.
Petitioners maintain that the process by which the rezoning was vetted and approved fell short of the applicable mandates. *1075 In evaluating such an argument, a court must keep in mind that the procedural requirements of SEQRA demand strict compliance (Matter of King v Saratoga County Bd. of Supervisors, 89 NY2d 341, 347 [1996]).
With exceptions not relevant here, the DCP as “lead” agency is required to assess, disclose to the public, and mitigate any harmful environmental consequences of action that it proposes to undertake, fund, or approve (6 NYCRR 617.2 [u]). If such action is in the Type I category, within the meaning of section 617.4 of the general regulations, it “carries with it the presumption that it is likely to have a significant adverse impact on the environment” (6 NYCRR 617.4 [a] [1]). Accordingly, “there is a relatively low threshold that must be met to require the issuance of a positive declaration under SEQRA” (Matter of Scenic Hudson v Town of Fishkill Town Bd., 258 AD2d 654, 655 [1999]). A “positive declaration” is a document acknowledging that proposed agency action may have a significant effect on the environment and therefore requires a vetting process, including, inter alia, the preparation of an environmental impact statement (EIS), that is more intensive and protracted than would otherwise be the case.
DCP does not dispute that the zoning amendments at issue fall within the Type I category, since they involve “adoption of changes in the allowable uses within any zoning district, affecting 25 or more acres” (6 NYCRR 617.4 [b] [2]). As indicated above, however, the CPC, on the basis of the original EAS, issued a negative declaration notwithstanding the presumption attaching to Type I actions.
Petitioners allege several grounds for challenging the adequacy of the procedure through which the rezoning was approved. First, they claim that the original EAS was a “sham” since it purportedly was “prepared, filed and approved on the same day.” It is noted that the document, as originally issued and as revised, contained some 90 pages, legal-sized, single-spaced text, as well as appendices and attachments, and was clearly the product of considerable information-gathering and analysis. In other words, even without reference to the history, hearings, discussions and studies predating the rezoning, the documents on their face are enough to refute petitioners’ allegation that the DCP’s environmental review in this case was undertaken in a patently hasty manner.
Second, petitioners claim that the rezoning is procedurally defective in the absence of input from the Departments of Parks
*1076 and Recreation, Transportation, and Buildings. They do not, however, cite any statutory or regulatory provision requiring input from those particular agencies in relation to an application such as the one at issue here. Petitioners have, however, cited the Appellate Division’s decision in Matter of Fisher v Giuliani (280 AD2d 13 [2001]), as authority for the proposition that the rezoning is defective in the absence of input from the Board of Standards and Appeals prior to its approval. Such citation of authority is misplaced, however, since in this case, unlike Fisher, the challenged agency action does not confer discretion on an agency (whether the Board of Standards and Appeals or otherwise) to confer some special permit, a contingency for which, as Fisher indicates (280 AD2d at 23), specific environmental review would be required.
Third, petitioners argue that the negative declaration issued in this case was unwarranted, given the presumption that a Type I action may have a substantially adverse effect on the environment and therefore presumptively requires, inter alia, the filing of an EIS. As it happens, the Fisher decision on which petitioners misplaced their reliance in another context is in this particular connection instructive. Thus, the Fisher court recognized that the aforementioned presumption is not conclusive, but is instead rebuttable under the following standard:
“In analyzing a SEQRA determination, a court is required to sustain an agency’s negative declaration unless the court concludes that it ‘ “was affected by an error of law or was arbitrary and capricious or an abuse of discretion” ’ . . . [T]he limited issue for the court’s review is whether the agency identified ‘ “the relevant areas of environmental concern,” ’ took a ‘ “hard look” ’ at them, and made a ‘reasoned elaboration of the basis for its determination.’ ” (280 AD2d at 19-20 [citations omitted].)
In other words, in reviewing the issuance of a negative declaration by an agency, the court is obliged to decide whether the agency “made a thorough investigation of the problems involved and reasonably exercised [its] discretion.” (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 364 [1986].) To be “thorough,” however, an investigation need not entail “every conceivable environmental impact, mitigating measure or alternative” (Matter of Neville v Koch, 79 NY2d 416, 425 [1992]).
Measured against such standard, the revised negative declaration, with its conclusion that the proposed amendments would *1077 have “no [foreseeable] . . . significant adverse effects on the environment,” survives scrutiny. Reference to the revised EAS on which the declaration was based confirms that the DCP considered its proposal’s short- and long-term effects (ECL 8-0109 [2]) as well as their primary and secondary effects (CEQR 1 [g]). Although petitioners fault the declaration as lacking in a sufficiently “elaborated” explanation for its basis, the elaboration required in a particular case is necessarily a function of the type of changes that a proposed action promises (or threatens) (see Har Enters. v Town of Brookhaven at 530). In this case, the conclusion announced by the declaration is further supported by the agency’s consideration, consistent with standard methodology, of a “reasonable worst-case scenario” in a “no-action” condition as compared to a “with-action” condition; its consideration also of the score of environmental review categories identified in the CEQR Technical Manual; and the proposal’s specified requirements for mitigation of hazards foreseeably incident to the amendments in question after a “hard look” (in this case, hazardous materials and threats to air quality).
This is not to ignore the fact that the City Council’s approval of the rezoning followed on the heels of the filing of the revised negative declaration. Nor is it to overlook petitioners’ argument that such approval was therefore fatally flawed. However, given the further fact that the Council is not required to make findings where a negative declaration is before it (6 NYCRR 617.1 [c]), the close proximity of time between such filing and approval is immaterial. As precedent establishes, the applicable laws are satisfied where “the required environmental review [was] made before the agency acts.” (Har Enters. v Town of Brookhaven at 531.)
Nor is this to overlook petitioners’ argument that the signature of the same DCP staff member on both the EAS and the negative declaration betrays some fatal flaw in the process by which the rezoning was approved. In such connection, it made sense that the negative declaration would be signed on behalf of the CPC by the member of its staff who supervised preparation of the EAS and was thus intimately familiar with the basis for its conclusion that the proposed action would have no significant adverse effect on the environment.
Although petitioners purport to dispute only the procedural aspects of the rezoning, their challenge is also substantive, in the sense that a major portion of the petition faults the content of the original EAS. In view of the revision of that document, *1078 the issues thus raised will be addressed here only to the extent that they have not been rendered moot by the revised EAS.
It is well established that, in evaluating an article 78 challenge to the substance of an agency’s SEQRA determination, “a court is not free to substitute its judgment for that of the agency on substantive matters,” but instead must satisfy itself that “in light of the circumstances . . . , the agency has given due consideration to pertinent environmental factors.” (Akpan v Koch, 75 NY2d 561, 571 [1990].) In other words, the court is authorized only to assure that the statutory mandates have been obeyed, and it is not licensed “to second-guess the agency’s choice” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]).
Petitioners argue that the negative declaration was not the product of a requisite “hard look” at social and economic, as well as environmental, factors. More than 20 years ago, in Chinese Staff & Workers Assn. v City of New York (68 NY2d at 365), the Court of Appeals made it clear that environmental impacts in a broad sense, including “existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character,” are the subjects of the environmental law’s concern (quoting ECL 8-0105 [6]; CEQR 1 [f]). Accordingly, it is beyond dispute that such social and economic considerations must be factored into an agency’s deliberations about whether its proposed action may have a significant effect on the environment (ECL 8-0103 [7]). But the revised EAS in this case reflects the CPC’s detailed consideration of such matters, and therefore passes muster.
Petitioners also challenge the rezoning on the ground that it was the product of the type of “segmented” review that has fatally tainted other agency action (see e.g. Matter of Defreestville Area Neighborhoods Assn. v Town Bd. of Town of N. Greenbush, 299 AD2d 631 [2002] [consideration of impacts from reasonably foreseeable development not included in environmental review for rezoning proposal]; Waldbaum, Inc. v Incorporated Vil. of Great Neck, 10 Misc 3d 1078[A], 2006 NY Slip Op 50119[U] [2006] [proposed rezoning review excluded consideration of impacts of proposed closure of local sewage treatment plants]). In this connection, petitioners refer to the agency’s socioeconomic analysis of the consequences of additional dwelling units spread over 15 sites within five neighborhoods. Reference to the revised EAS indicates, however, that the agency’s analysis in this connection involved one study area which was *1079 subjected to the type of preliminary analysis suggested by the CEQR Technical Manual. In other words, there is no basis to fault the agency for impermissible segmentation in its analysis.
The petition also alleges that the EAS was fatally lacking in documentary support such as “field visits, photographs, interviews and other available information.” Although CEQR contains certain provisions for documentation of the lead agency’s study of environmental effects, it does not purport to prescribe such documentation inflexibly, i.e., it leaves the extent and type of documentation to a rule of reason based upon the action to be studied. In this connection, it is noted that petitioners have not explained how the absence of any particular document or type of document renders the rezoning inadequately supported.
Accordingly, it is adjudged that the petition is denied and the proceeding is dismissed.